# Appeal of the Trustees of the University of Pennsylvania.

97    187|
213    ᶜ503|

97    187
f37SC ¹537

1. In the distribution of a decedent's estate where there is a deficiency after the payment of debts, expenses and specific legacies, the loss is to be borne entirely and proportionally by those pecuniary legacies which are in their nature general. An annuity charged on the personal estate is for this purpose to be esteemed a general legacy.

2. Where there is any valuable consideration for a testamentary gift or the relinquishment of any right or interest, such legacy will be entitled to preference of payment over other general legacies which are mere bounties.

3. A general legacy to a volunteer will not be entitled to any exemption from abatement on the ground of its being applied to any particular object or purpose, as where the bequest is to a wife or child or to a charity.

4. Although a testator may by special provision in his will exempt one or more legacies from abatement at the expense of others, yet the presumption of intended equality so far exists and governs that it can only be overcome by unequivocal evidence of intent to the contrary.

5. A testator may by the terms of his will prevent a legacy lapsing by the death of the beneficiary occurring before the testator's death; but to effect this object he must declare, either expressly or in terms from which it can be collected with sufficient clearness, what person or persons he intended to substitute.

6. A testator provided, inter alia, as follows: "I give and bequeath $7500 unto A. B., daughter of C. D.; but it is my will that whatsoever amount her son E. F. shall owe me, principal and interest, shall be taken to have been so much paid on account of said legacy, and his notes shall be handed over to her or her representatives." Unlike the other clauses in testator's will this clause was combined with one bequeathing a legacy to a grandchild of C. D. *Held*, that the terms of the will did not prevent a lapse of A. B.'s legacy, she having died before the testator.

February 10th 1881. Before MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ. SHARSWOOD, C. J., did not sit.

Appeal from a decree of the Orphans' Court of *Philadelphia county*: Of July Term 1880, No. 123.

This was an appeal of the Trustees of the University of Pennsylvania from a decree of the said court dismissing their exceptions to, and confirming the adjudication of the judge auditing the first account of the executors of Dr. George B. Wood, deceased.

Two questions were raised by the record and assignments of error. (1) Whether a certain annuity and a certain capital sum bequeathed by Dr. Wood to the Trustees of the University should abate *pro rata*, as legacies, with other pecuniary legacies, or whether they constituted a fund which the testator had engaged to provide by a binding promise, and were, therefore, exempt from abatement. (2) Whether a certain legacy to Hannah Chamberlain lapsed and fell into the residue.

[Appeal of the Trustees of the University of Penna.]

1. The facts relating to the first question were as follows: Dr. George B. Wood, of the city of Philadelphia, died in March 1879, at the age of seventy-two years, leaving neither widow nor issue; having made his will dated June 22d 1871, with seven codicils, the last dated July 12th 1875, duly proved, containing a great number of devises and specific and pecuniary legacies. The residue of the estate is thereby given to the University of Pennsylvania. The estate has thus far proved insufficient to pay all the legacies.

The will contains various provisions for the benefit of the University of Pennsylvania, with which institution Dr. Wood had been intimately associated during his life. He graduated from the department of arts in 1815, and from the medical department in 1818. In 1835, he became professor of materia medica, which position he held for thirty-five years. He was then chosen Emeritus professor in the medical department, and for many years was a trustee of the institution; and these latter positions he held up to the time of his death.

In January 1865, Dr. Wood, being then the chairman of the standing committee of the Trustees of the University on the medical department, wrote the following communication:

" To the Board of Trustees of the University of Pennsylvania:

" The chairman of the standing committee on the medical department proposes to appropriate out of his income the annual sum of $2000, or as much as may be required, to be applied by the board of trustees to the support of an auxiliary faculty of professors in the medical department, for instruction in those subsidiary branches of knowledge, which, though not at present taught in the school, are essential to a thorough medical education.

" He makes this proposition with some diffidence, as he has no right to suppose that the board can have so much confidence in his disinterestedness or stability of purpose as to justify them in commencing an enterprise, any misdirection or failure of which might in some measure compromise the dignity of the board.

" He has only one condition to suggest. Though his income at present is such as to justify him in making this appropriation, and he can see no reasonable ground to apprehend that it might be so far diminished as to render the appropriation at any time in the future inconvenient, yet in the uncertainty of affairs, it may happen that this sum may be necessary to supply his ordinary expenditures, and he therefore feels it incumbent on him to make the appropriation conditional on his future ability to maintain it without material personal inconvenience; he pledges himself, however, that should the board so far honor him as to accept his proposition, no trifling cause shall be permitted to interfere with its due fulfilment on his part.

[Appeal of the Trustees of the University of Penna.]

" Should the board intimate their approval of the proposed measure, the committee will proceed, in accordance with the duty already assigned to them by the trustees, to consider and mature a plan for the establishment of the contemplated faculty of lectureships to be submitted to the board.

" The undersigned has only further to observe, that should the proposed measure be carried into effect, he would feel personally much obliged to the gentlemen of the board if they would consider the arrangement, so far as he is personally concerned, as strictly confidential, and to be known only to the trustees.

Very respectfully,<br>GEORGE B. WOOD,

Chairman of Committee on Medical Department.

Philadelphia, January 31st 1865."

The proposition thus made was accepted by the trustees, who adopted and placed upon their minutes the following resolutions:

" Resolved, That the trustees gratefully accept the proposition made by Dr. George B. Wood, for the founding of an auxiliary faculty in the medical department of the university.

" Resolved, That the thanks of the trustees are due, and are hereby presented to Dr. Wood for the munificent offer he has made for the support of such an auxiliary faculty, and that they receive the same as additional evidence of his interest in the prosperity, welfare, and usefulness of his *alma mater*, in whose service he has devoted a large portion of his life, with results alike honorable to himself and the university.

" Resolved, That the committee on the department of medicine be authorized and requested to make all arrangements that may be required to organize the proposed faculty, and to provide for the election of professors as lecturers for the several chairs which may by such organization be established."

On the 4th of April 1865, Dr. Wood wrote further to the trustees as follows:

" The chairman of the committee on the medical department wishes in addition to say, in his individual capacity, that should the plan presented by the committee receive the sanction of the board, he desires to substitute for the $2000 annually, before placed at the disposal of the trustees, the sum of $2500 on the same conditions, the amount being necessary to carry into effect the plan referred to, which, so far as concerns that feature requiring additional outlay, was adopted by the committee, not only with his hearty approval, but, in fact, at his suggestion, after full consideration, and with the conviction on his part that it was essential to the completeness of the proposed measure.

GEORGE B. WOOD.

April 4th 1865."

This communication accompanied the plan referred to, reported by the committee, for the organization of the auxiliary faculty of the medical department.

The trustees adopted the report, and the auxiliary faculty was instituted accordingly. It comprised five professorships, each of whom was to receive $500 per annum, to be paid at the end of the course, upon the certificate of the dean that the duty had been properly performed. "No salary to be paid if no lecture should be given; and in case of an incomplete course a proportionate part of the salary only to be paid."

The last provision in the plan proposed by the committee and adopted by the trustees was as follows:

"The professors shall be appointed for one year, after public notice of at least three months, at the regular meetings of the board in November next—nominations having been made at a preceding meeting, and shall be reappointed annually thereafter during satisfactory service, at the regular meetings of the board in the same month, so long as the plan for the establishment of the auxiliary faculty of medicine now adopted shall continue in operation."

The plan thus started has continued in operation ever since. Dr. Wood while he lived always paid the stipulated sum of $2500 per annum. It was shown that all of the income of the university was so appropriated that but for the aid to be furnished by Dr. Wood the auxiliary faculty could not have been created, and that it was created solely in consequence of the propositions contained in the communications of January 31st and April 4th 1865.

The will is elaborately drawn. The sections containing the bequests to the University of Pennsylvania were the following:

Sect. 27. "Whereas, at my request, the trustees of the University of Pennsylvania have established a faculty co-operative with the medical department, consisting of five professorships, viz.: 1. Botany; 2. Zoology and Comparative Anatomy; 3. Mineralogy and Geology; 4. Medical Jurisprudence; and 5. Hygiene; which I have aided by an annual payment; and it is my desire that the said faculty should be permanently established: Therefore, for that purpose, I give and bequeath unto the trustees of the University of Pennsylvania, fifty thousand dollars, interest to be kept safely invested in ground-rents, first mortgages, or in the loans of the city of Philadelphia, the state of Pennsylvania, or of the United States; and I advise, in order to keep said capital unimpaired, that a few hundred dollars of the increase, and of all gains on resales of investments, should be added to the principal; and also all income which may accrue at such times as any of the professors' chairs shall remain unfilled, which may in time enable the trustees to purchase illustrative apparatus or material, or specimens for the several courses of said branches of science, or to increase the

number of chairs in said faculty, or the salaries of the professors in the existing chairs. It is my desire and will that twenty-five hundred dollars of the income of said endowment, when all the chairs are filled, shall be applied to the payment of the professors' salaries, or five hundred dollars unto each who shall have delivered a bona fide course of lectures, of which the trustees shall be the judges; which lectures will preferably be in the months of April, May and June. Such salaries will be paid after the delivery of the course of lectures, and will be in addition to any fees that may be paid by the pupils."

By section 28 a specific gift of medical plants is made to the University, " a portion of the income of the investments mentioned in the preceding section, not otherwise consumed, to be applied to the preservation and increase of said plants."

By section 29, $5000 are given to the University for the establishment of a botanical garden and conservatory.

Sect. 30. " Having heretofore engaged to pay, and paid, to the trustees of the University of Pennsylvania, twenty-five hundred dollars a year, or so much as they should require for the support of said auxiliary faculty of professors, I direct my executors to continue such payments as may be needed, within said amount, until said legacy shall be paid to an amount to yield an equal income, which will be without deduction from the legacy."

By section 31, a legacy of $75,000 is given for the erection and maintenance of a clinical hospital, under the control of the trustees of the University.

By section 54, the residue of the estate, real and personal, is also given to the University.

By section 23 of a codicil of even date with the will, the residue of the proceeds expected to arise from an extensive cranberry cultivation, on the testator's estate in New Jersey, is given to the University of Pennsylvania, one-half to be applied to the support of the clinical hospital, and the other half for the general purposes of the University.

By section 16 of the codicil, it is provided as follows:

" My executors are hereby enjoined to distribute or pay no part of my estate in fulfilment of my will, except to pay legacies of less amounts than $5000 ; and except, also, the payments necessary to continue those annual payments which I have for some years made by agreement with certain institutions, in the interval before getting the principal of their legacies, until the whole of the hundred acres, more or less, shall have been put under cranberry culture; and for the speedy accomplishment of that object, not only all the net proceeds of the cranberries, but also so much of the whole income of my estate as can be usefully applied, shall with such exception be used therefor."

In section 52 the testator directed as follows : " Should my

[Appeal of the Trustees of the University of Penna.]

estate prove deficient to pay all the legacies, then the pecuniary legacies will abate ratably."

The cranberry cultivation did not fulfil the testator's expectations, and owing to depreciation in the testator's real property, it was estimated that his estate would pay between sixty and seventy-five per cent. of all the pecuniary legacies.

Before the auditing judge, it was conceded that the legacy of $5000 given by section 29, for the establishment of a botanical garden, and that of $75,000 given by section 31, for the erection and maintenance of a clinical hospital, are subject to abatement under the provision of the will just recited. But it was contended by the Trustees of the University, that no abatement should take place with respect to the annuity of $2500 per annum provided by section 30, or the capital fund of $50,000 given in section 27, on the ground, that, by the letters and actions of Dr. Wood in his lifetime, and the action by the trustees thereby induced, Dr. Wood had bound himself to provide after his death for the increased expenditures and engagements thus incurred at his instance; and that these bequests are mere testamentary declarations of his fulfilment of such obligation. On the other hand, it was claimed that the said legacy of $50,000, and the annual payment of $2500, should abate ratably with the other pecuniary legacies.

The auditing judge (Penrose, J.), in the adjudication, held as follows: * * * "The question is a difficult one. As a general rule, in the event of the deficiency of assets, all pecuniary legacies abate pro rata; and this is in accordance with the express direction of the testator. It is also well settled that for the purposes of abatement, annuities are to be treated as general pecuniary legacies: Theobald 459; Williams on Executors 1367. This rule it is said, however, 'is to be understood only as among legatees who are all volunteers; for if there be any valuable consideration for the testamentary gift, as where it is given in consideration of a debt owing to the legatee, * * * such legacy will be entitled to a preference of payment over the other general legacies which are mere bounties:' Williams on Executors 1364; Theobald, p. 459; Blower *v.* Morret, 2 Ves., Sr., 420; Heath *v.* Dendy, 1 Russ. 543; Norcott *v.* Gordon, 14 Sim. 258, &c., &c. The first point to be considered therefore, is, was there an obligation on the part of Dr. Wood to the University, which could have been enforced against his estate."

[The auditing judge here recited the letters of Dr. Wood to the trustees, and their resolutions and action in pursuance thereof, as hereinbefore set forth, and proceeded]: "It must be admitted that these acts of the trustees, based upon Dr. Wood's promise to pay an annual sum, furnish a consideration which would give a binding effect to such promise. It may also be conceded that *while*

[Appeal of the Trustees of the University of Penna.]

*he lived* the promise was obligatory, subject only to the condition of his ability to pay. A promise to pay when able is undoubtedly valid: Addison on Contracts, (3d Am. ed.) sect. 411; Groome's Appeal, 35 Leg. Int. 70; Waters *v.* Earl of Thanet, 2 Queen's Bench 757. It is different, of course, where the ability to pay is by the terms of the contract made dependent upon the judgment of the debtor, as in Nelson *v.* Von Bonnhorst, 5 Casey 352.

"But what is there to continue the liability *beyond the period of Dr. Wood's lifetime?* It is not denied that a contract to pay a perpetual annuity is possible. In such case, however, appropriate words should be used, and the court must be convinced that such was the intention of the parties. * * * Not only are there no words here showing an intention to bind the estate of the promisor after his death, but the agreement is to pay out of ' his income ; ' and this is made subject to the condition that he is not thereby to be put to inconvenience. At his death *his* income ceases. What is there to require payment from any other source ? That this was the limit of his liability is indicated further by the provision in the plan adopted by the committee with regard to the appointment of professors. For while the ordinary professors at the university are, as was testified by the secretary of the board of trustees, elected for an indefinite term, the auxiliary faculty are appointed *annually*, and only so long as the plan for the establishment of the auxiliary faculty of medicine shall continue in operation. The plan is referred to in the letter of 4th of April 1865, and is to be read in connection with it in order to ascertain the extent of the liability which was then created.

"In the opinion of the auditing judge no right of recovery, apart from the provisions in the will, existed in the university at Dr. Wood's death.

"If this view be correct, then the provisions referred to in the will, not being in discharge of an obligation, would fall under the general principle and be subject to abatement with other pecuniary legacies.

"There is nothing in the will which shows that the testator considered himself bound to pay for a longer period than his own lifetime. In section 27, he speaks of having *aided* by an annual payment, and of his *desire* that the faculty *should be permanently* established. In section 30, he says that he had heretofore ' engaged to pay,' but he adds, ' *and paid*,' as if he regarded his engagement as completed. So in section 16 of the codicil he speaks of the annual payments which he *had made* for some years ' by agreement.' This is all; and it is entirely consistent with an agreement to pay so long as he lived and no longer. If section 30 were read by itself, it might be supposed the testator intended that under all circumstances, and in spite of any deficiency of his estate, the sum of $2500 was to be paid to the university until so

1 OUTERBRIDGE—13

much of the sum mentioned in section 27 was paid as would yield an income of that amount. But this section is to be read in connection with the codicil, which was executed the same day, and which provided (section 16) that no legacy over $5000 should be paid until the lands in New Jersey were placed in cranberry culture. This might not be for some years to come ; and in the meantime therefore he gives to the university an annuity not exceeding $2500, the payment of which is to continue until the legacy of $50,000 is paid, viz., until the land has been put under cranberry culture.

" He has declared in express terms that ' *the* pecuniary legacies,' *i. e.,* all the pecuniary legacies, should abate. He has omitted to except any. We have no right to say that he did not intend to include so considerable a one as that given to the university, the payment of which would require a very large portion of his entire estate."

2. The facts relating to the second question in the case were as follows :

Dr. Wood by the 39th section of his will bequeathed as follows : [Unlike the other sections, the 39th was written in the same paragraph with the 38th, as here printed.]

"38. Unto Elizabeth H. Sellers, daughter of Mary Vanhorn, who was daughter of Mrs. Willis, sister of Peter Hahn, I give twenty-five hundred dollars. 39. I give and bequeath seventy-five hundred dollars unto Mrs. Hannah Chamberlin, a daughter of Mrs. Willis aforesaid ; but it is my will that whatsoever amount her son David Edwards shall owe me, principal and interest, shall be taken to have been so much paid on account of said legacy, and his notes shall be handed over to her or her representatives."

Mrs. Chamberlin, who was not a relative by blood (though she was connected by marriage) of the testator, died in his lifetime, leaving a son, Horatio F. Chamberlin (to whom letters of administration upon her estate have been granted), and grandchildren, children of a deceased child.

The Trustees of the University claimed that this legacy lapsed by reason of Mrs. Chamberlin's death in the testator's lifetime, and that its amount fell into the residue of the estate and passed under the residuary clause of the will to the University. The auditing judge held on this point as follows :

" The Acts of Assembly, which in certain cases prevent 'lapse where the legatee dies in the testator's lifetime, do not apply to this case. But it seems clear that there is a substitutional gift here to the 'representatives' of Mrs. Chamberlin ; and that the legacy, therefore, does not lapse. The direction that the notes of David Edwards (which, however, seem to have been paid, as none have been found) should be handed over to the legatee, 'or her representatives,' makes it plain that, to this extent, the legacy was not intended to fail by reason of her death before the testator ; and

as, when so handed over, they are to be regarded as 'so much *paid on account* of said legacy,' it would follow that the *whole* of that *on account* of which the notes are so paid was equally intended to go to the representatives. See Gibbons *v.* Fairlamb, 2 Casey 217.

"The word 'representatives' here is probably used in the sense of next of kin, as there is nothing to indicate that they are to take in a fiduciary capacity (Theobald 283). In such case the legacy would go to Mrs. Chamberlin's issue. It was agreed, however, that if it should be held that the legacy did not lapse, it should be awarded to Horatio F. Chamberlin, administrator of Mrs. Hannah Chamberlin, by whom the distribution could be more conveniently made.

"It is, therefore, subject to abatement by reason of the deficiency of the estate: so awarded."

Exceptions were filed to the adjudication by the Trustees of the University, which, after argument, were on July 3d 1880, dismissed by the court and the adjudication was confirmed. The Trustees of the University thereupon took this appeal, and filed the following assignments of error:

1. Because the court below erred in holding that the evidence submitted to them was not sufficient to establish a contract between the testator and these appellants, binding him to the payment of the expenses of the auxiliary faculty which he procured to be founded, not exceeding $2500 per annum.

2. Because the court below erred in not directing the accountants to pay the full amount of $2500 for the yearly expenses of the auxiliary faculty aforesaid, which the appellant organized and kept up at his request, and in not directing the sum of $50,000, provided for in the will, to be paid over in full to the appellants.

3. Because the court below erred in holding the provisions of testator's will, so far as the same applied to the yearly sum of $2500 per annum and the capital sum of $50,000, as legacies liable to abatement, when said provisions were but the fulfilment of his stipulations and undertakings with the appellants.

4. Because the court below erred in holding that the legacy of $7500, bequeathed by said testator's will to Mrs. Hannah Chamberlin, did not lapse by reason of her death before said testator's death, and in awarding the same to her administrator for the use of her next of kin.

5. Because the court below erred in overruling the exceptions filed therein by the appellants to the adjudication or decree of distribution.

*Joseph B. Townsend* (with whom was *Eli K. Price*), for the appellants.—1. The determining question is whether it was the intention of Dr. Wood, and the understanding of the trustees, that

his engagement to support the auxiliary faculty should terminate with his life, or continue and be fulfilled after his death. The court below conceded that the promise was obligatory while he lived, subject only to the condition of his ability to pay. All the circumstances attending the founding of the department, considered in connection with Dr. Wood's language in his will, indicate that his agreement with the trustees was intended by him, and understood by them to be for a permanent endowment. He was sixty-eight years of age when he created this auxiliary department, and he intended to endow it with the permanent life of the university itself, not to let it die or beg other support at his death. The only condition was, that if, during his lifetime, his own income, in the uncertainty of affairs, should be so reduced as to prevent his making the annual appropriation "without material personal inconvenience," he should be relieved from the "pledge." This contingency never happened. The trustees, of whom Dr. Wood was one, advertised in the annual catalogue that the degrees would be conferred on those qualified "who shall have attended two full courses of lectures in the auxiliary department of medicine." The faculty was to be perpetual, though the professors were to be elected annually. Dr. Wood in the 27th item of his will recited that the faculty had been *established* at his request, and his desire that it should be *permanently* established. In the 30th item he recites his engagement, his fulfilment of it during life, and directs his executors to *continue* the annual payment until the capital sum bequeathed should yield an equal income. That he recognised that the university would contract the same obligations after his death, and that his payment of them was obligatory, is shown by the order that the annual payment should not fail of being furnished, whether it came from income or principal of his estate, until the payment over of the capital fund. In the 16th item of the first codicil, he defers distribution of his estate for a time, except payment of small legacies, "and except also the payments necessary to *continue* those annual payments which I have for some years made *by agreement* with certain institutions," &c. He gave the endowment fund of $50,000 in order to finally fulfil his obligation and to relieve the rest of his estate from the annual payments. It is not necessary that there should have been a contract right, legally enforceable, or for breach of which damages might be recovered. The law is well settled that where funds are bequeathed, in pursuance of any legal or moral obligation on the part of the testator, or where they are impressed with a trust recognising equitable rights in others, such bequests will be supported without abatement as superior to the claims of the legatees or volunteers: Burridge *v.* Bradyl, 1 P. Wms. 126; Ex parte Pye, 18 Vesey, Jr., 140; Sarah Zane's Will, Brightly's Rep. 347, note; Helfenstein's Estate, 27 P. F. Smith 328; Ellison *v.* Ellison, 6 Vesey 656; Richardson

[Appeal of the Trustees of the University of Penna.]

*v.* Richardson, L. R., 3 Equity Cas. 686; Williams on Executors 1364; Theobald on Construction of Wills 459; Blower *v.* Morrett, 2 Vesey, Sen., 420; Davies *v.* Bush, 1 Younge 341; Stahlschmidt *v.* Lett, 1 Sm. and Giff. 421; Williamson *v.* Naylor, 3 You. & Coll. 208; Philips *v.* Philips, 3 Hare 282.

2. As to the lapse of the legacy to Mrs. Chamberlin, she was not a relative saved by the statute from lapse. In the words of gift in the first clause of section 39, no substitutionary words are used. A legacy given to one, his executors, administrators, and assigns, is not saved from lapse, because that is expressing no more than the law infers, viz., that if the legacy becomes vested by the survival of the legatee who dies before payment, it must be paid to the executors. "Representatives," or "legal representatives," are the equivalent of executors or administrators. To create an alternative or substitutionary gift to another party as legatee, in place of a first-named legatee, the intent must clearly appear from the words of the will: Ralston *v.* Waln, 8 Wright 279, 287; Dickinson *v.* Purvis, 8 S. & R. 71; Patterson *v.* Hawthorne, 12 S. & R. 112; 2 Williams on Executors 1084, 1085–6; Gibbons *v.* Fairlamb, 2 Casey 217. The expression " to her or her representatives," at the close of the second clause of the 39th section, relates only to the handing over of the notes of Mrs. Chamberlin's son, held by the testator, which Mrs. Chamberlin, or—in case she survived him but died before payment—her representatives should be obliged to take in part settlement. To hold that Mrs. Chamberlin's " representatives " take the $7500 as substitutionary legatees, by direct gift from the testator, not claiming in a representative capacity through Mrs. Chamberlin, is to re-write that clause of the will. Unless they could so take, the legacy lapsed and fell into the residue; Gibbons *v.* Fairlamb, 2 Casey 217; Woolmer's Estate, 3 Wharton 477; Nyce's Estate, 5 W. & S. 260; Loxley's Estate, 6 W. N. C. 529.

*R. Francis Wood,* and *George W. Biddle,* for the appellees.— We do not admit that there is any evidence of a contract during Doctor Wood's life. The delicate caution apparent in his letters not to fetter himself, is clear to any one who knew the man as his co-trustees did. He could, without legal liability, have given notice of withdrawal any year. But there is, in any view, no evidence of any contract to extend beyond his death. No intent can be gathered from the will that the university is to be preferred to the other beneficiaries. A substantially similar provision was made by section 26, in favor of the College of Physicians, and another by section 2 of the second codicil, to his cousin, Mrs. Bacon. If the bequest to the university do not abate, neither can the latter. The testator, however, directed what the law would have implied, that in case of deficiency, all his pecuniary bequests should abate. The

annuities given temporarily, until payment of the principal legacy, are mere added legacies, subject, like the principal ones, to pro rata abatement.   Doctor Wood had a strong purpose in behalf of the University of Pennsylvania, but he also had testamentary purposes in favor of his family and other objects, and the scheme of his will shows he intended that if any abatement was necessary, all pecuniary gifts should abate equally.   See Fidelity Co.'s Appeal, Linnard's Estate, 37 Leg. Int. 293.

Mr. Justice TRUNKEY delivered the opinion of the Court, February 28th 1881.

Whether Dr. Wood was legally bound to pay the University of Pennsylvania the sum of $2500 annually, during his life, is unnecessary to determine.   Did he contract for such payments to be made after his death?   He proposed to appropriate out of his income the annual sum of $2500, to be applied by the trustees to the support of an auxiliary faculty of professors in the medical department, stating he did so with some diffidence, as he had no right to suppose that the board could " have so much confidence in his disinterestedness or stability of purpose, as to justify them in commencing an enterprise, any misdirection or failure of which might in some measure compromise the dignity of the board," that he made " the appropriation conditional on his future ability to maintain it without material personal inconvenience ;" and pledged himself, should they accept, that no trifling cause should interfere with its due fulfilment on his part.   The trustees gratefully accepted, organized the faculty, and provided that the professors be appointed for one year, and reappointed annually during satisfactory service, " so long as the plan for the establishment of the auxiliary faculty of medicine now adopted shall continue in operation."   They elected other professors for an indefinite period, but for this auxiliary faculty for one year.   They understood that he intended himself to judge of his future ability to make the annual payments without inconvenience.   His purpose was to make such payments.   The trustees believed he would; and he did during his life.   Both parties acted in accord with the promise contained in the proposition ; but not a word in the proposition or resolutions tend to establish an agreement that he would provide for the payment of that sum, or any other, annually after his decease.

The nature of Dr. Wood's pledge is shown by a written evidence, and that is the " engagement" and " agreement" referred to in his will.   If nude or for good consideration, on its face, he was under no moral or legal obligations to provide an annuity or an endowment fund.   Probably he contemplated making the university a chief beneficiary of his estate ; he did not promise this, and held out no reason for the trustees to expect it, other than continuous acts of generosity.   His declarations in the will are evidence of

his own understanding of the writings.    In sect. 27, after reciting that the trustees established the faculty at his request, which he had aided by an annual payment, and that it is his "desire that said faculty and professorships shall be permanently established," he says: "Therefore, for that purpose I give and bequeath unto the trustees of the University of Pennsylvania $50,000."    This reveals that the testator deemed the "establishing" and "founding" of the faculty and professorships temporary, and that he desired they should be permanent.    To that end he made the bequest. Here is his first expression for a permanent endowment, not in performance of an obligation, but to accomplish a desire.    In sect. 16, of a codicil of same date as the will, he enjoined his executors to pay no legacies except those less than $5000, and except also the payments necessary to continue those annual payments which he had for some years made by agreement with certain institutions, in the interval before getting the principal of their legacies, until the accomplishment of his directions for putting a tract of land under cranberry culture.    He says, in sect. 30 of the will, " having heretofore engaged to pay and paid to the trustees" $2500 a year, I direct my executors to continue such payments until said legacy shall be paid, which will be without deduction from the legacy. The words "agreement" and "engaged to pay and paid," following sect. 27, would fairly apply to the proposition for the temporary establishment of the faculty, and the direction to continue the yearly payments, until the legacy of $50,000 shall be paid, is a bounty in furtherance of the permanent establishment he desired. It seems very clear that the testator was not bound by a contract for such payments to be continued after his decease.

Neither the acts of the testator in his lifetime, nor the declarations in his will, recognise equitable rights in the appellant to any part of his estate standing in his name.    He paid all he promised; he gives legacies for specified purposes.    We have carefully considered the able argument of appellant on this point, sound in its statement of the law, but we fail to discover any evidence of property held in trust by the testator for the university, or that the university had an equitable interest in any property held in the testator's name.

The rule is, that where there is deficiency after payment of debts, expenses and specific legacies, the loss shall be borne entirely and proportionally by those pecuniary legacies which are in their nature general.    A general legacy to a volunteer will not be entitled to any exemption from abatement, on the ground of its being applied to any particular object or purpose, as where the bequest is to a wife or child, or to a charity.    But if there be any valuable consideration for the testamentary gift, or the relinquishment of any right or interest, such legacy will be entitled to

preference of payment over other general legacies which are mere bounties. An annuity charged on the personal estate is a general legacy, and in cases of deficiency all annuities and legacies abate ratably, for since they cannot all be paid in full, they shall all abate ratably, on the principle of the maxim, "equality is equity" or "equity delighteth in equality." This rule is subject to exceptions, for there are cases, where some annuities and legacies are to be paid in priority to others; but the onus lies on the party seeking priority to make out that such priority was intended by clear and conclusive proof. In absence of such proof, the testator must be deemed to have considered that his estate would be sufficient, and, consequently, not to have thought it necessary to provide against a deficiency by giving priority to some of the objects of his bounty. If the chances of deficiency are anticipated and provided for by the terms of the will then the directions of the testator will govern. It is always a question of intention, and when the intent of the testator is manifest to give one general legatee priority over others that intention shall prevail. As between legacies which are in their nature mere bounties, the presumption of intended equality exists and governs, unless overcome by unequivocal evidence to the contrary. No priority will be allowed where the expressions of the will are ambiguous: Towle v. Swasey, 106 Mass. 100; Miller v. Huddlestone, 3 Macn. & G. 513; Attorney-General v. Hudson, 1 P. Wms. 675; Attorney-General v. Robins, 2 Id. 23; 2 Williams on Ex'rs 1364–1371.

Applying these principles to this case, the Orphans' Court was clearly right in ruling that the legacy of $50,000, and until its payment the sum of $2500 per annum, to the trustees of the auxiliary faculty, must abate ratably with the other pecuniary legacies. It seems plain that no conclusive proof can be furnished from the language of the will of intent to give these legacies priority over others; if there be expressions which tend to favor priority they are much too ambiguous to be relied on in support of a preference. Indeed, the intention as to all pecuniary legacies is that they shall stand on equal footing. The testator anticipated the possibility of a deficiency, and made this provision: "Should my estate prove deficient to pay all the legacies, then the pecuniary legacies will abate ratably"—precisely what the law would have declared had he given no such direction. He made numerous bequests to near relatives and friends, as well as to charities, and as he expressed no particular intent as to any one of the pecuniary legacies or annuities, and all are to volunteers, they must abate proportionably in accord with the general intent. We discover no sufficient evidence of an intended priority in favor of the appellant.

The second question presented is, Did the legacy of $7500 to Hannah Chamberlin lapse by reason of her death before the testa-

tor ? This legacy is given as follows: "I give and bequeath $7500 unto Mrs. Hannah Chamberlin, a daughter of Mrs. Willis, aforesaid; but it is my will that whatsoever amount her son David Edwards shall owe me, principal and interest, shall be taken to have been so much paid on account of said legacy, and his notes shall be handed over to her or her representatives."

The word representatives may mean next of kin, or descendants, or executors, or administrators, according as the intention of the testator is manifested in the will. It has been held to mean the husband of a deceased legatee: Gibbons v. Fairlamb, 2 Casey 217. In all cases where it is apparent in the context of the will that a word is not used in its ordinary sense, if the intention can be ascertained, it shall govern rather than a technical definition, or the usual sense. In this will there is little room for interpretation; the testator seems to have been at no loss for an intelligent use of words. When he intended to give the interest of a sum to one for life, and at the death of the legatee the principal to his legal representatives, he said so, as in the bequest to John Garrison. If he meant a legacy should not lapse, in case of the decease of the legatee before himself, he so directed, as when he added to the bequest to John Quin, "if he deceased to go to his children." Evidently, he was mindful of collateral inheritance taxes, and gave certain legacies clear of taxes. He closed the codicil of even date with his will, thus: "And should any provision of my will fail by lapse or otherwise, it is my will that all dispositions so failing shall fall into and become part of the residue of my estate, and as such to vest in the residuary legatee, under the residuary clause of my will." Surely, he contemplated the probability of lapse of some of the numerous legacies.

There is not a substitutionary word applied to the legacy of $7500 to Mrs. Chamberlin. The clause directs that her son's indebtedness, whatsoever it may be, shall be so much paid on account of said legacy, and the notes handed to her or her representatives.

What is there in this will to show the words were not used in their usual sense? Is it the general and particular accuracy of language in every other part? A testator may prevent a legacy from lapsing; but to effect this object he must declare, either expressly or in terms from which it can be collected with sufficient clearness, what person or persons he intended to substitute for the legatee dying in his lifetime: 2 Williams on Ex'rs 1210. This legacy is to Mrs. Chamberlin, not to her son, or her representatives. An advancement on account of the legacy, made in her lifetime, will not prevent a lapse. We are of opinion that the terms of this will, instead of showing the testator's intention to prevent a lapse of the legacy to Mrs. Chamberlin, in case of her death before his, show that in such event he intended said legacy, or so much

Appeal of the Trustees of the University of Penna.]

of it as had not been advanced, should fall into and become a part of the residue of his estate.

> So much of the decree as directs payment of money on the legacy to Hannah Chamberlin is reversed, and record remitted for further proceedings. Costs of appeal to be paid by the executors out of moneys of the estate.